IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARDO ACEVEDO-VAZQUEZ [1]
JOHN SANTOS-VAZQUEZ [2]

Defendant.

CRIMINAL NO. 16-642 (FAB)

## REPORT AND RECOMMENDATION

## INTRODUCTION

On October 13, 2016, Leonardo Acevedo-Vázquez ("Defendant Acevedo" or "Acevedo") and John Santos-Vázquez ("Defendant Santos" or "Santos") were charged in a three count Indictment.   Count One charged Acevedo and Santos with a carjacking, in violation of Title 18, United States Code, §§ 2119(1) and 2. Count Two charged Acevedo and Santos with using and brandishing a firearm during and in relation to a crime of violence, in violation to Title 18, United States Code, §§ 924 (c)(1)(A)(ii) and 2. Count Three charged Acevedo with being a prohibited person in possession of a firearm, that is a convicted felon, in violation to Title 18, United States Code, § 922(g)(1) and 924(a)(2). (Docket No. 13).

On January 13, 2017, Acevedo and Santos filed a "Joint Motion to Suppress" seeking to suppress all physical, electronic and digital evidence, as well as testimonial evidence and statements attributed to, or obtained from them, or personal property as a result of the alleged illegal arrest and seizure performed by law enforcement officers on October 7, 2016.   Defendants argue their arrests were made without a warrant, without

_____

probable cause and based on an uncorroborated anonymous tip.    In addition, Defendant Acevedo posits that his alleged statements are the fruits of the poisonous tree and subject to exclusion for a violation of the Fourth Amendment. (Docket No. 34).

On January 13, 2017, the Court referred the "Joint Motion to Suppress" to the undersigned for a report and recommendation.    (Docket Nos. 36 and 37).

Defendants argued at length in their "Joint Motion to Suppress" (Docket No. 34) that the anonymous tip itself was not sufficiently reliable to establish reasonable suspicion to conduct a Terry stop on their person nor to arrest them.

On February 21, 201, 2017, the Government filed a brief Opposition to Defendants' "Joint Motion to Suppress" arguing there was probable cause for the arrest of both Defendants. (Docket No. 47). However, the Government failed to address in its Opposition Defendants' contention of lack of reliability of the tip and the case law submitted by Defendants in support thereof.    (Docket No. 47).    As such, the Government was granted ten (10) days to supplement its Opposition (Docket No. 47) to specifically address Defendants' argument that there is no basis to establish the reliability of the alleged tip to justify a Terry stop. (Docket No. 48).

On March 6, 2017, the Government filed an amended Opposition to Defendants' Motion to Suppress in compliance with the Court's Order. The Government argued that, based on the totality of the circumstances, the officers had reasonable suspicion to base their investigatory stop of both Defendants. The Government further alleged that the information received regarding Defendants was corroborated. The person who supplied

_____

the information was a former police officer known to be reliable, the suspects matched the description, were encountered in a high crime area late at night and they attempted to evade police. Further, the Government asserted that the officers had corroborating information prior to the tip which, combined with subsequent events, was sufficient for a Terry stop. (Docket No. 49).

On July 26, 2017, the suppression hearing was called but not held.   Both Defendants indicated they were accepting the plea offers from the Government and wanted to plea guilty. As such, the matter was referred back to the presider.    (Docket No. 58).

Defendants then each filed a motion for change of plea.    (Docket Nos. 59 and 64). The change of plea hearings were scheduled for August 10, 2017 before Hon. Judge Francisco A. Besosa.   The change of plea hearings could not be held inasmuch as both Defendants requested additional time to ponder whether to plea or not.    (Docket No. 66).

On August 24, 2017, the change of plea hearings were called but not held. Defense counsel informed Judge Besosa that both Defendants wanted to refile their motion to suppress.   (Docket No. 69). On the same day, both Defendants filed separate motions requesting the suppression matter to be re-opened.    (Docket Nos. 70 and 71).

On August 25, 2017, Judge Besosa referred the suppression request to the undersigned for hearing and report and recommendation.    (Docket No. 72).

On September 5, 2017, the suppression hearing began.   The government called San Juan Municipal Police Officer Fernán Méndez-Sosa ("Officer Méndez"). Direct and

United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 4
_____

cross-examination conducted.    (Docket No. 75).

After some procedural matters and continuances before and after Hurricane María, the hearing on the Motion to Suppress was held on February 13, 2018.   The Government called San Juan Municipal Police Officers Jose Vázquez-González ("Officer Vázquez") and Sergeant José A. Colón-Rodríguez ("Sgt. Colón").   Direct and cross-examination conducted. Defense Exhibits A through C were presented and admitted into evidence. Both parties submitted the case. The parties requested time to submit briefs, for which they needed the transcripts of the hearings. The Court granted the Government fifteen (15) days, after the transcripts were received, to submit its brief.   Defendants requested to file a joint brief, for which they were given twenty (20) days after the Government filed its brief.   (Docket No. 83).

On February 27, 2018 and March 19, 2018, the transcripts of the suppression hearing were filed.    (Docket No. 90 and 93).

After requesting several extensions of time, the Government filed its post-hearing brief on June 16, 2018. (Docket No. 114).

On July 13, 2018, Defendants filed their joint post-hearing brief.    (Docket No. 117).

## FACTUAL BACKGROUND

Defendants Acevedo and Santos did not take the stand on their behalf during the suppression hearing.   Moreover, Defendants did not submit any findings of fact in their joint post-hearing brief nor did they contest the ones submitted by the Government in its

United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 5
_____

post-hearing Memorandum, which are based on the evidence presented at the suppression hearing and which cite specific portions of the transcript of the hearing. (Docket No. 117).

As such, for judicial economy and in light of their accuracy, the findings of facts proposed by the Government in its post-hearing Memorandum of Law (Docket No. 114, pp. 2-9), which are supported by reference to the evidence presented at the suppression hearing, are incorporated herein and made part of this Order, except for a diagram at Docket 114, pp. 5-6 which was not presented during the suppression hearing.[1]

On the evening of Friday, October 7, 2016, the owner of a 2002 light-colored Cadillac Escalade was carjacked at a train station by two men, one with a tear-shaped tattoo beneath an eye.   The suspects used a .38 revolver and a knife.

On Saturday, October 8, 2016, a food truck nearby the Antillas police station was robbed at gunpoint by two men in a light-colored Cadillac Escalade, one of whom had a tear-shaped tattoo underneath one of his eyes. Witnesses got the last three digits of the license plate.

Puerto Rico Police Department Officer Méndez, who was on duty on October 8-9, 2016, was in the police station in Antillas when a victim from the food truck robbery came in to report the incident. (D.E. No. 93, hereinafter "Supp. Hr'g 1", pp. 8-9 and 19). Officer

_____

[1] Defendants assert there are some inconsistencies in the three versions of facts submitted by the Government. However, these inconsistencies are inconsequential inasmuch as the version of facts included in the Government's Memorandum of Law, which is based on the evidence presented at the suppression hearing during which the witnesses were under oath, controls the suppression issue regardless of other facts previously proposed by the Government which were ultimately proven to be different after the suppression hearing. In other words, the Court will only consider those facts established during the suppression hearing and supported by the record. See Docket No. 114, page 2, footnote 1 for the explanation provided by the prosecutor to this situation.

Méndez overheard the description of the robbers, as well as the vehicle they were driving and the last three digits of its license plate, as one of the victims of the robbery relayed it to the on duty desk sergeant at the police station. (Supp. Hr'g 1, pp. 7-9, 16 and 19).

Later during his shift, in the early morning hours of October 9, (Supp. Hr'g 1, pp. 5 and 8; D.E. No. 90, hereinafter "Supp. Hr'g 2", pp. 40-41), Officer Méndez was patrolling in his police car. (Supp. Hr'g 2, p. 13). Officer Méndez and others were on patrol in the area of Río Piedras, working extra shifts, because of the high crime rate in that area. (Supp. Hr'g 1, p. 28). While patrolling, Officer Méndez noticed a vehicle that matched the description of that involved in the food truck robbery. (Supp. Hr'g 1, pp. 8-9 and 30). In addition to it matching the physical description -- a vehicle of "claro", or "light", color -- Officer Méndez noticed that the last three digits of the license plate matched those of the vehicle driven in the food truck robbery. (Supp. Hr'g 1, pp. 38-39).

Officer Méndez called in the plate number of the vehicle, and was informed that the tag matched a vehicle that had been carjacked. (Supp. Hr'g 1, p. 9). Officer Méndez touched the hood of the car and it was warm. (*Id.*, pp. 10-12). Officer Méndez shone a flashlight on the vehicle and saw bullets inside the car, on the passenger side. (Supp. Hr'g 1, pp. 12-14). Officer Méndez therefore called the information - that it matched the description from the food truck robbery, that it was warm, that the plates came back for a carjacked vehicle and that he had seen bullets on the passenger side - over the police radio to his supervisor. (Supp. Hr'g 1, p. 15). He also broadcasted this information over the police radio to other patrol units. (Supp. Hr'g 1, pp. 24, 30 and 34; "Supp. Hr'g 2", p.

_____

6).

Meanwhile, PRPD Sgt. Colón, a 19-year veteran of the PRPD who was supervising a unit in the Río Piedras area between 10 p.m. on October 8 and 6 a.m. on October 9, 2016 (Supp. Hr'g 2, pp. 68-69), was patrolling nearby and heard the call over the police radio that a carjacked vehicle had been found. (Supp. Hr'g 2, p. 69). Sgt. Colón, who heard Officer Méndez' broadcast, proceeded to the scene. (Supp. Hr'g 2, pp. 69 and 70). When Sgt. Colón arrived at the scene, he saw Officer Méndez watching over the light-colored Escalade. (Supp. Hr'g 2, p. 69). Because there was a good deal of police presence near the carjacked vehicle, Sgt. Colón continued down the street in his police vehicle. (Supp. Hr'g 2, p. 70). As he continued down the road, Sgt. Colón received a call on his mobile phone from "a former fellow officer" (Supp. Hr'g 2, pp. 70), Roberto Ortiz ("Ortiz"), (Supp. Hr'g 2, p. 83), "that [he] had supervised in the past" when he was in the Tactical Unit. (Supp. Hr'g 2, pp. 70, 84). Upon receiving the phone call, Sgt. Colón drove to where Ortiz was located down the street at a bar called "El Coquí". (Supp. Hr'g 2, pp. 94 and 114-115). Ortiz indicated to Sgt. Colón that the drivers of the carjacked vehicle (the Cadillac Escalade that was being guarded by Officer Méndez) (Supp. Hr'g 2, p. 117) were walking towards nearby Gándara Avenue, having just left an establishment in the area where the former officer was working. (Supp. Hr'g 2, pp. 70-71). Sgt. Colón testified that Ortiz told him that he had personally seen the individuals getting out of the Cadillac Escalade before they came into the bar. (Supp. Hr'g 2, pp. 94-95). Ortiz also told Sgt. Colón that a patron in the bar had also come up to him and told him that the individuals had gotten out of the Cadillac.

_____

(Supp. Hr'g 2, p. 95). Ortiz gave Sgt. Colón a description of the clothing the suspects were wearing and their skin tone. (Supp. Hr'g 2, pp. 71, 117).

After having received this information from his former colleague, Sgt. Colón testified that he returned to his patrol car, and proceeded down Gándara Avenue "to corroborate [his] fellow officer's information." (Supp. Hr'g 2, p. 71). Rather than immediately proceeding on foot, Sgt. Colón remained in his vehicle waiting for reinforcements because he believed that, since the investigation had to do with a carjacking, the individuals might be armed. (Supp. Hr'g 2, p. 71). Sgt. Colón testified that he was still in his police car when he first saw the suspects, which matched the description given to him by former colleague Ortiz, but that he remained in his car at first for safety reasons. (Supp. Hr'g 2, p. 72). As Sgt. Colón turned onto Avenida Gándara, he testified that he became aware that reinforcements were on their way, and he saw the suspects, who "were exactly as [Ortiz] had described them", cross Avenida Gándara "over Barbosa" and walk towards a city park known as "Zombie" Square. (Supp. Hr'g 2, p. 71).

Sgt. Colón broadcasted over police radio that he was following the suspects that had been identified to him as being in the carjacked vehicle. (Supp. Hr'g 2, p. 9). Sgt. Colón testified the individuals (later identified as Defendants) matched the description he had gotten from former Officer Ortiz. (Supp. Hr'g 2, p. 72). Sgt. Colón was continually on his police radio, giving updates as the pursuit continued. (Supp. Hr'g, p. 10). When Sgt. Colón notified other officers in the area, via police radio, that he had seen the suspects and was pursuing them, the call was also heard by two other PRPD officers on duty,

_____

namely, PRPD Officer José Vázquez-González, Badge No. 1901 (Supp. Hr'g 2, p. 12) and PRPD Sergeant Hernández ("Sgt. Hernández"), Badge No. 1448, who were patrolling together in a police vehicle, with Sgt. Hernández driving. (Supp. Hr'g 2, p. 10). They had remained in the area when they heard the activity over the police radio, listening to the updates. (Supp. Hr'g 2, p. 10).

Sgt. Colón testified that, when he first saw Defendants he was in his patrol car, but once other officers arrived one the scene — "among them . . . Vázquez, Fernández, Pons and Quintana", he exited his patrol car and pursued the suspects on foot. (Supp. Hr'g 2, p. 72). Sgt. Colón asked both individuals to stop. (Supp. Hr'g 2, p. 73). Ignoring the command, the individuals "proceeded to walk faster." (Supp. Hr'g 2, p. 73). At that juncture, Officer Quintana arrived at Sgt. Colón's location to provide backup to Sgt. Colón in intervening with the suspects. (Supp. Hr'g 2, p. 73). Officers Quintana and Colón continued to follow the suspects on foot and ordered them to stop. (Supp. Hr'g 2, pp. 73-74). However, Defendants continued to ignore commands and went through Zombie Square and towards some stairs at the end of the square. (Supp. Hr'g 2, pp. 74-75). Sgt. Colón testified that Defendants Acevedo and Santos went down the stairs in a hurry, and as they did so, Sgt. Colón heard a loud sound of something that had been thrown hard hitting against a wall. (Supp. Hr'g 2, p. 75). Sgt. Colón testified that, based on his 19 years' experience as a police officer, it sounded to him as if a firearm was thrown against the wall. (Supp. Hr'g 2, p. 76).

In the meantime, Sgt. Colón had notified fellow officers over the police radio when

Defendants were entering Zombie Square. (Supp. Hr'g 2, pp. 10 and 46). Since Officer Vázquez was familiar with the area, he and his partner had positioned themselves at an exit of Zombie Square, where the stairs ended, anticipating that the suspects might flee in that direction. (Supp. Hr'g 2, pp. 10 and 16). While waiting at the exit, a residential area illuminated by street lamps, (Supp. Hr'g 2, pp. 25 and 54), Officers Vázquez and Hernández, who were uniformed, (Supp. Hr'g 2, p. 43), encountered Defendants Acevedo and Santos. (Supp. Hr'g 2, p. 10). Officer Vázquez testified that at that time of night/early morning, on that residential street, individuals are not usually seen going in and out of houses on the street. (Supp. Hr'g 2, pp. 55 and 60). Sgt. Colón testified that, although there were a few people scattered about in the area of Zombie Square, there were no people on the residential street where Defendants were apprehended and the gun was recovered. (Supp. Hr'g 2, pp. 119-20).

At the bottom of the stairs, Officer Vázquez had gotten out of the police vehicle and shouted to Defendants to "hit the floor/ground!" multiple times, but Defendants did not comply, and Officer Vázquez testified that he had the impression they were poised to flee. (Supp. Hr'g 2, pp. 10 and 46). Accordingly, Officers Vázquez and Hernández pushed Defendants against the police vehicle to stop them from fleeing, and for the safety of the officers. (Supp. Hr'g 2, pp. 10and 52). Within seconds of Officers Vázquez and Hernández encountering Defendants (Supp. Hr'g 2, pp. 53, 104 and 105), Officers Vázquez and Hernández saw Sgt. Colón and Officer Quintana coming down the exit stairs, and Sgt. Colón called to Officers Vázquez and Hernández that the area needed to be searched

because he had heard something being thrown against a wall during the pursuit. (Supp. Hr'g 2, pp. 10, 47). Sgt. Colón also testified that, when he reached the point that he was able to view the bottom of the stairs, he saw that fellow officers were detaining Defendants.   Accordingly, Sgt. Colón went back to where he had heard the sound to search for the firearm. (Supp. Hr'g 2, pp. 10, 46, 48, 5 and, 75). Sgt. Colón testified that, upon reaching the site he saw, in plain view, some bullets that looked like rounds from a revolver on the sidewalk. (Supp. Hr'g 2, p. 76). Sgt. Colón also found a revolver in the small concrete box garden area in front of the residence[2], and he called to Officers Vázquez and Hernández that he had found the firearm. (Supp. Hr'g 2, pp. 10, 46, 48, 56 and 77).

Defendants Acevedo and Santos had been detained briefly against the police car, without handcuffs for several seconds (Supp. Hr'g 2, pp. 53, 104 and 109) because they were not heeding police commands and looked as if they were going to flee (Supp. Hr'g 2, p. 10, and 46-47), until Sgt. Colón, who was searching the area from where he had heard the sound, called to Officers Vázquez and Hernández that he had found the firearm. (Supp. Hr'g 2, pp. 10, 46, 48, 56 and 79). Once the weapon was recovered, Defendants Acevedo and Santos were handcuffed and placed under arrested, around approximately 3:30 a.m. on October 9, 2016. (Supp. Hr'g 2, pp. 10, 14, 48 and 79-80).

---

2 Sgt. Colón testified that the concrete garden box is small, approximately 2 ½ feet in height, and the entire thing can be seen from the sidewalk. (Supp. Hr'g 2, pp. 77-78).

United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 12
_____

## LEGAL DISCUSSION

### A.    Investigatory Stop based on Reasonable Suspicion.

The issue of whether the stop of Defendants Acevedo and Santos was legal and based on reasonable suspicion, as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), is first addressed.    An investigative stop, also known as a Terry stop occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion.    *Id.* at 6, 88 S.Ct. 1868 (*citing* United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 145-146, 92 S.Ct. 1921 (1972).    *See* Terry, 392 U.S. at 1, 88 S.Ct. at 1868.

"[T]he police officer's action [must] be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." Commonwealth v. Silva, 366 Mass. 402, 406, 318 N.E.2d 895 (1974). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690 (1981). A combination of suggestive

_____

circumstances, largely innocent in and of themselves, when considered in their totality, may constitute the "reasonable suspicion" necessary to justify a Terry stop, United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581 (1989), particularly when viewed by an experienced police officer. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, (2002). As in the case of an arrest, facts must be assessed in light of the collective knowledge of the officers involved. United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675 (1985); United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002). The test is an objective one, "view[ing] the circumstances as a whole." Whren v. United States, 517 U.S. 806, 812-813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

The "collective knowledge" principle is applied when reviewing the existence of probable cause. That is, we look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer. *See* Illinois v. Andreas, 463 U.S. 765, 772 n.5, 103 S.Ct. 3319 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all."); United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (same); United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017) (same). The Court of Appeals for the First Circuit has recognized the collective knowledge doctrine as a legitimate means through which reasonable suspicion may be established. United States v. Barnes, 506 F.3d 58 (1st Cir. 2007); United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) (same).

Concerning investigative stops, the Court must determine "not whether the police

United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 14
_____

had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.*   The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances, which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997) (*citing* United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)).   To fulfill the second prong, the Court must examine the totality of the circumstances.   *See* United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); United States Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

When evaluating the validity of an intervention between and officer and an individual, the courts must consider all of the relevant circumstances. The circumstances dictating the officer's actions are "not to be dissected and viewed singly; rather they must be considered as a whole." United States v. Soares, 521 F.3d 117, 120 (1st Cir. 2008) (*quoting* United States v. Ivery, 427 F.3d 69, 73-74 (1st Cir. 2005)).   In determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.' " Soares, 521 F.3d at 120 (*quoting* United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004); United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994)).

_____

Pursuant to the credible evidence presented during the suppression hearing and after assessing the credibility of the witnesses, the initial stop of Defendants Acevedo and Santos was based on reasonable suspicion and appropriate at its inception. The law enforcement agents' initial detention of both Defendants was legal inasmuch as, based on the totality of the circumstances, it was reasonable to believe that both Defendants were involved in criminal activity.

The Court agrees with the Government that the law enforcement officers investigating the carjacking and food truck robbery had reasonable suspicion to stop both Defendants based on the collective knowledge they had of the location of the suspects, their physical description, that they were armed, and that the two individuals they encountered that night had thrown something which hit hard on a wall and, based on the 19 years of experience of a police officer, sounded like if a firearm was thrown against a wall while being chased by law enforcement. Based on this information, the law enforcement officers had reasonable suspicion to stop Defendants to perform and investigative stop when they saw both Defendants.

More specifically, Officer Méndez was on patrol and noticed a vehicle that matched the description provided by the victim, which he overheard at the station, which was involved on the food truck robbery. Officer Méndez noticed that the last three digits of the license plate matched those of the vehicle driven in the food truck robbery. Officer Méndez called in the plate number of the vehicle and was informed that it was the vehicle, which had been carjacked. Officer Méndez touched the hood of the car and it was warm.

Officer Méndez shone a flashlight on the vehicle and saw bullets inside the car, on the passenger side. Officer Méndez then called the information (that it matched the description from the food truck robbery, that it was warm, that the plates came back for a carjacked vehicle and that he had seen bullets on the passenger side) over the police radio to his supervisor and to other patrol units.

Sgt. Colón, who was patrolling the area, heard via radio the information transmitted by Officer Méndez that the carjacked vehicle had been found. Sgt. Colón went to the scene where he saw Officer Méndez watching over the Cadillac Escalade. While at the scene, and contemporaneous to the finding of the Cadillac Escalade, Sgt. Colón received a call from Ortiz, a former police officer whom Sgt. Colón knew because he supervised him. Sgt. Colón then went to "El Coquí" where Ortiz was.   Ortiz personally told Sgt. Colón that the drivers of the carjacked vehicle (the Cadillac Escalade that Officer Méndez was guarding) were walking towards nearby Gándara Avenue, having just left an establishment in the area where Ortiz was working. Ortiz told Sgt. Colón he had personally seen the individuals getting out of the Cadillac Escalade before they came into the bar. Ortiz also told Sgt. Colón that a patron in the bar had told him that the individuals had gotten out of the Cadillac Escalade. Ortiz gave Sgt. Colón a description of the clothing the suspects were wearing and their skin-tone. Sgt. Colón then proceeded to Gándara Avenue.

At the time, Sgt. Colón went to Gándara Avenue and he saw Defendants, he had knowledge of the following:

1. Officer Méndez had found the Ford Escalade, it matched the description from the food truck robbery, its hood was warm, the plates came back for a carjacked vehicle and he had seen bullets on the passenger side.

2. Officer Ortiz had seen the individuals getting out of a Cadillac Escalade before going inside "El Coquí."

3. The individuals were walking towards Gándara Avenue after they left "El Coquí."

4. A patron at "El Coquí" had told Ortiz that the individuals got off the Cadillac Escalade.

5. Ortiz described to Sgt. Colón what the suspects were wearing and their skin-tone.

6. The area was a high crime area and it was late at night.

Sgt. Colón knew the above information when he saw Defendants. Sgt. Colón's observations corroborated the information he had received which, coupled with the actions of Defendants when they were encountered by Sgt. Colón, provided reasonable suspicion to stop both Defendants. It is uncontested that both Defendants ignored the commands given by Officers Colón and Quintana to stop and started walking faster to avoid speaking with them. As Defendants went down the stairs in a hurry, Sgt. Colón was in pursuit and heard what he believed to be, based on his 19 years' experience in law enforcement, the sound of a firearm being thrown hard and hitting a wall. As properly argued by the Government, Defendants' actions and the sound heard by Sgt. Colón, while

_____

pursuing Defendants on foot, further added to reasonable suspicion that a crime had been committed.   The totality of the circumstances and the progression of the facts developed throughout the investigation the night of the events provided substantial evidence for any law enforcement officer to conclude that when the officers saw Defendants Acevedo and Santos it was reasonable to believe that they were engaged in ongoing criminal conduct. *See* United States v. Am, 564 F.3d 25, 31 (1st Cir. 2009).

In sum, under the totality of the circumstances and based on the personal observations of the law enforcement officers that night, they had a reasonable, articulable suspicion about Defendant Acevedo and Santos' involvement in some criminal activity. Thus, Defendant Acevedo and Santo's initial stop was valid and within the parameters of Terry, 392 U.S. at 21; United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).

As such, the "Joint Motion to Suppress" on the above grounds is without merit.

**B. Anonymous Tip.**

The Government contends that the law enforcement officers did not base their investigatory stop of Defendants on an anonymous tip inasmuch as they had descriptions and information from several sources. Moreover, former Officer Ortiz had seen the suspects.   However, even if he would not had seen them, the officers corroborated the anonymous tip with their own observations and subsequent interactions with both Defendants.   (Docket No. 114, p. 11).

In turn, Defendants posit there was no indicia of reliability in the anonymous tip. As such, Defendants claim the stop was not based on reasonable suspicion and was illegal.

_____

The Fourth Amendment permits police officers to conduct a brief investigative stop if they have "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " Navarette v. California, 572 U.S. 393, 134 S.Ct. 1683, 1687 (2014) (*quoting* Cortez, 449 U.S. at 417-18, 101 S.Ct. at 690). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.' " *Id.* (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412 (1990)). "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.' " *Id.* at 1688 (*quoting* White, 496 U.S. at 327, 110 S.Ct. 2412).

The Supreme Court has recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375 (2000) (*quoting* White, 496 U.S. at 327, 110 S.Ct. at 2412). We note that "there is more than one way to demonstrate" reasonable suspicion based on an anonymous tip, Navarette, 134 S.Ct. at 1692, and that we must "take[ ] into account 'the totality of the circumstances—the whole picture,' " *id.* at 1687 (citation omitted). At base, the reasonable suspicion inquiry requires a "commonsense approach." *Id.* at 1690.

The Court of Appeals for the First Circuit ruled in United States v. Taylor, 162 F.3d 12, 18 n. 2 (1st Cir. 1998) that information regarding an informant's reliability could be imputed from one desk officer to field officers cooperating in an investigation. *See* also United States v. Fiasconaro, 315 F.3d at 36 (1st Cir. 2002).

_____

Moreover, knowing the confidential informant's name, for example, increases the chance that agents can come down hard on the tipster if the tip is false, and that threat ups the chance that the tip is reliable. *See* J.L., 529 U.S. at 270, 120 S.Ct. 1375 (indicating that unlike an anonymous informant's tip, a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is much more trustworthy). United States v. Sánchez, 817 F.3d 38, 43 (1st Cir. 2016).

Turning to the instant case, Sgt. Colón knew former Officer Ortiz' name and had personal experience with him because Ortiz had worked under Sgt. Colón's supervision previously. As such, unlike an anonymous tip, Sgt. Colón could gauge his credibility and hold him accountable if necessary.   Sgt. Colón testified that he spoke personally with former Officer Ortiz and he told Sgt. Colón that he had seen the suspects exiting the carjacked vehicle. At that time, Sgt. Colón was already looking for two armed individuals in that area who were related to a carjacked vehicle, which had been located by fellow Officer Méndez. As properly argued by the Government, Ortiz' information that he had seen two individuals exiting the Cadillac Escalade and that the suspects hurriedly exited the club when they saw police presence, corroborated the information Sgt. Colón already had. Sgt. Colón observed the two individuals walking in the direction Ortiz had indicated and they evaded the officers who were trying to investigate. The suspects matched the description provided by Ortiz and they were encountered in a high crime area late at night.

For the sake of the argument, the Court agrees with the Government that, even if

United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 21
_____

the information received by Sgt. Colón through former Officer Ortiz was based solely on

an anonymous tip, "it was justified by both its content and context," because by the time

Sgt. Colón learned about the two individuals who had been in "El Coquí" with firearms,

he already had information that a carjacked vehicle was parked nearby and warm to the

touch, and fellow officers were on the lookout for two individuals of a certain description

in the area who were likely armed. In addition, the license plate had been checked and

confirmed that it was a carjacked vehicle.   Sgt. Colón also had a description of the

perpetrators as provided by a victim, a description of the vehicle and the three last digits

of the license plate. Sgt. Colón, a police officer with 19 years of experience, testified under

oath that his former supervisee, Ortiz, told him that he had seen the individuals in

question get out of the carjacked vehicle, which police were watching. Ortiz gave Sgt.

Colón the description of the two individuals (clothing and skin-tone), told him the

direction they were heading, and that they had just left the "El Coquí."   Sgt. Colón was

able to corroborate this information when he saw both Defendants shortly thereafter, in

the location where Ortiz said they would be, matching the descriptions. This provided Sgt.

Colón with reasonable suspicion to base the investigative Terry stop. Sgt. Colón's

suspicion increased when both Defendants purposefully ignored his calls to stop and

increased their pace to evade police.   As proffered by the Government, the reasonable

suspicion transitioned into probable cause to arrest when Sgt. Colón heard Defendants

throwing what he believed, in his experience, to be a firearm, as explained below in more

detail.

<u>United States of America v. Leonardo Acevedo-Vázquez [1] and John Santos-Vázquez [2]</u>
Criminal No. 16-642 (FAB)
Report and Recommendation
Page 22
_____

Thus, taking into account the evidence presented during the suppression hearing in this case, the Court concludes the stop in this case was not only based on the corroborated information received in the tip but on the observations of the officers at the scene.[3]  Accordingly, the tip bore sufficient "indicia of reliability" to justify the <u>Terry</u> stop.

**C**.    **Warrantless Arrest.**

A warrantless arrest is constitutionally valid if, at moment the arrest is made, officers have probable cause to make it; that is, if at that moment, facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.    <u>United States v. Ayres</u>, 725 F.2d 806 (1st Cir. 1984); <u>Young</u>, 105 F.3d at 6 (same).    Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives.    *Id.*

Probable cause "is a practical, nontechnical conception offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime, and on the other hand in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection." <u>Brinegar v. United States</u>, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949).

_____

3 The Supreme Court held in <u>Alabama,</u> 496 U.S. at 325, 110 S.Ct. at 2412, that the officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity. By accurately predicting future behavior, the tipster demonstrated "a special familiarity with respondent's affairs," which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." *Id.,* at 332, 110 S.Ct. 2412. <u>See</u> <u>also</u> <u>Navarette,</u> 572 U.S. at 393, 134 S. Ct. at 1688.

_____

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See* United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994). To establish probable cause, the Government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991); United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999) and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

It is unquestioned that when a defendant is arrested, he may be searched both for evidence of his crimes and for the safety of the officers. "It is also well established that the defendant's lawful arrest permits the police to search his person . . ." Fiasconaro, 315 F.3d at 37. *See also* United States v. Doward, 41 F.3d 789, 792-93 (1st Cir. 1994). "[I]t is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant." United States v. Winchenbach, 197 F.3d 548, 552 (1st Cir. 1999).

Turning to the instant case, while Sgt. Colón was pursuing both Defendants,

Officers Vázquez and Hernández were at the bottom of the stairs and aware of the pursuit because they were kept informed of the situation by police radio.   Officers Vázquez and Hernández saw both Defendants descending the stairs in a hurry. Sgt. Colón called out to Officers Vázquez and Hernández that he had heard a firearm being thrown. Officers Vázquez and Hernández ordered Defendants to "hit the floor". This was done as a safety measure inasmuch it was around 3:30 in the morning at the time Officers Colón, Quintana, Vázquez and Hernández encountered Defendants, who matched the descriptions given to them. The law enforcement officers suspected the individuals were in the area because they had recently left "El Coquí" and they had found the stolen vehicle nearby with its hood warm. They also knew the individuals were likely armed because the carjacking had been committed with a gun and a knife, and the food truck robbery had been committed with a gun. Officers also testified that the area was high-crime, further lending to officers' need to take safety precautions. In addition, the individuals failed to follow the officers' instructions to stop and exhibited a behavior as if they were going to flee.[4]   Meanwhile, Sgt. Colón found the revolver in the location that he had heard the same hitting hard on a wall. To prevent flight and for safety, the Officers pushed Defendants against the patrol car for a matter of seconds until Sgt. Colón called out that he had found the thrown weapon. At that point, the Officers placed Defendants under arrest. Based on these facts, and under the totality of circumstances, the law enforcement

---

4  *See* United States v. Halloway, 962 F.2d 451, 461 (5th Cir. 1992) which held that defendant's attempted escape from officers was sufficient additional factor to turn officers' reasonable suspicion to probable cause.

officers had probable cause to arrest both Defendants.

The determination of whether probable cause exists must not rest on isolated facts but depends on the cumulative effect of the facts in the totality of the circumstances. Probability, not a *prima facie* showing of criminal activity, is the standard.    Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333 (1959). The inquiry into probable cause to support an arrest is not necessarily based upon the offense actually invoked by the arresting officer, but upon whether the facts known at the time of arrest objectively provided probable cause to arrest.    *See* United States v. Jones, 432 F.3d 34 (1st Cir. 2005) (*citing* Devenpeck v. Alford, 543 U.S. 146, 125 S.Ct. 588 (2004)).

In sum, as accurately summarized by the Government, Defendants matched the description of the suspects, were seen exiting the Cadillac Escalade, quickly exited the nightclub when they saw police, evaded police, attempted to escape through Zombie Park, and threw a gun as they were exiting down the stairs of Zombie Park. The gun's bullets were splayed against the sidewalk, as if they had been ejected upon being thrown. The gun was found in a small concrete flower bed in the location from where Sgt. Colón had heard the sound. The gun was a revolver, which matched the description given by the victim of the carjacking. The collective information known to officers was sufficient to warrant a reasonably prudent person in believing Defendants had committed an offense.[5]

---

[5] The First Circuit has recognized that reasonable suspicion or even probable cause can be established by the "collective knowledge" or "pooled knowledge" principle. *See, e.g.,* United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986) (finding probable cause for arrest on the basis of collective knowledge); United States v. Pardue, 385 F.3d 101, 106-07 (1st Cir. 2004). Accordingly, the "focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." Fiasconaro, 315 F.3d at 36 (quoting Winchenbach, 197 F.3d at 555). Specifically, reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion. Burns v. Loranger, 907 F.2d 233, 236 n. 7 (1st Cir.

As such, the arrests of Defendants Acevedo and Santos without a warrant was justified.

It is worth noting that Defendants did not take the stand during the suppression hearing, in an attempt to contradict the testimonies of the law enforcement officers, even though they had the opportunity to do so. Except for presenting three (3) exhibits, no other documentary evidence or testimonial evidence was presented by Defendants. As such, the testimonies of the officers as to how the facts develop the night of Defendants' arrest are uncontested.

In light of the above, the Court finds that Defendants Acevedo and Santos' warrantless arrest were legal and based on probable cause. Accordingly, suppression fails on this ground as well.

### D.    Acevedo's post-arrest statements.

Defendant Acevedo succinctly posits in the "Joint Motion to Suppress" that, when a Defendant makes inculpatory statements that are the product of an unconstitutional search and seizure, the statements are fruits of the poisonous tress and shall be suppressed based on the underlying constitutional violation.

The doctrine of "fruit of the poisonous tree" dictates that evidence obtained during a search may be so tainted by the illegality of a previous Fourth Amendment violation, so as to render it inadmissible. *See* Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266 (1939). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be

_____

1990); *see also* Taylor, 162 F.3d at 18 n. 2 (finding that information regarding an informant's reliability can be imputed between officers "cooperating in an investigation") (quoting Meade, 110 F.3d at 193).

derivative of an illegality or 'fruit of the poisonous tree.' " Segura v. United States, 468 U.S. 796, 804, 104 S.Ct. 3380 (1984) (*quoting* Nardone, 308 U.S. at 341, 60 S.Ct. 266) (internal citations omitted).

Since Defendant Acevedo's arrest was not in violation to his Fourth Amendment rights, as explained above, Acevedo's post-arrest statements cannot possibly constitute fruits of any illegality. *See, e.g.*, Segura, 468 U.S. at 815 ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.").

In fact, Defendant Acevedo only claims that his statements were the fruit of the poisonous tree.  Defendant Acevedo did not allege in the "Joint Motion to Suppress", subsequent memorandum nor during the suppression hearing that, the statements he provided to the law enforcement agents under custody, were not knowing and/or involuntary or that they were given without him being advised of his Miranda rights. Defendant Acevedo has not alleged either that he was under coercion or duress when he waived his rights and made the inculpatory statements to the officers.

In view of the above, suppression is unwarranted on this ground.

## CONCLUSION

For the above state reasons, it is recommended to the Court that Defendants Acevedo and Santos' "Joint Motion to Suppress" (Docket No. 34) be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and

_____

recommendation.    Failure to file same within the specified time waives the right to appeal this order.    Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).    *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 25th day of July of 2018.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE